Filed 12/9/13  P. v. Ryan CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

<table>
<tr><td>THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAMES RYAN,<br><br>    Defendant and Appellant.</td><td>H039193<br>(Santa Clara County<br>Super. Ct. No. 211693)</td></tr>
</table>

Following a court trial, the court found true beyond a reasonable doubt that defendant James Ryan was a sexually violent predator (SVP) under the Sexually Violent Predator Act (SVPA).  (See Welf. & Inst. Code, § 6600 et seq.)[1]  By order filed May 30, 2012, the court ordered him committed for an indeterminate term to the custody of the California Department of Mental Health (now, State Department of State Hospitals; hereafter the Department).  The order specified that it was "subject to the ultimate decision in *People v. McKee* (2010) 47 Cal.4th 1172" (*McKee I*).  On November 9, 2012, after the California Supreme Court denied review in *People v. McKee* (2012) 207 Cal.App.4th 1325 (*McKee II*), the trial court filed an order committing defendant for an indeterminate term "as previously ordered."

_____

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

On appeal, defendant argues (1) that he was not evaluated with a valid "standardized assessment protocol" as mandated by section 6601, subdivision (c) and thus, that the subsequent commitment proceedings violated due process, and (2) that the SVPA's indeterminate commitment violates principles of equal protection. We conclude that neither of defendant's claims is meritorious, and we will therefore affirm the judgment.

## BACKGROUND

### A. Facts Underlying the Sexually Violent Offenses[2]

In 1998, defendant was 23 years old when he met Elana, a 13-year-old girl. Elana told defendant that she was having family problems because her stepfather had molested her. Defendant told her that he would keep her safe. The two started dating and began a sexual relationship.

On one evening, defendant took Elana to an abandoned house. According to Elana, she agreed to bondage. Defendant tied her hands with a soft white rope. He also tied a rope around her eyes so that she could not see and around her mouth to gag her. Elana was naked. Defendant licked her body, and then penetrated her anus with his finger. She screamed and tried to get away from defendant. Elana reported that she had previously told defendant never to touch her anus. She told him to stop, and he complied.

Elana also reported that in 1999, she and defendant engaged in auto-erotic asphyxiation. During intercourse, defendant grabbed Elana by the neck and choked her until she passed out. Approximately 10 minutes after she awoke, he performed the same act.

Elana reported these incidents to the police. The police executed a search warrant of defendant's home and found bondage toys, several photographs of young females taken at defendant's home (including a photograph of a young naked female who was

---

[2] The summary of defendant's offenses is taken from the evaluation reports.

bound and gagged), photographs of young girls, likely under the age of 18, taken from pornographic websites, drawings of women in bondage, and notebooks containing teen pornography sites and numbers for teen phone sex.

In late 2002 or early 2003, defendant met Samantha, a 15-year-old girl. Samantha met defendant through her friend, Cheryl[3]. Samantha went to defendant's house after school one day and went to his bedroom. Defendant told her he wanted to have sex with her. Samantha told defendant that she did not want to have sex, and she started to get up to leave the room. Defendant grabbed Samantha from behind, took her purse off, and threw her onto his bed. He then ripped off her clothing and raped her. Defendant apologized to Samantha the next day. Samantha continued to see defendant, who raped her several more times. She recounted that defendant used a leather whip and a wooden paddle on her rear end, which left non-permanent marks on her. Defendant also refused to wear a condom, claiming he was allergic to latex and that he hoped he could make Samantha pregnant so that he could " 'use their child for a sex slave.' " Defendant would also show Samantha pornography. Additionally, Samantha recounted an instance where defendant slapped her on the face when she tried to leave.

Samantha's friend, Cheryl, also reported that she was a victim and that defendant had engaged in sexual activity with her. Cheryl was 17 years old when she first had intercourse with defendant. At that time, she had problems with her mother, and defendant offered her a place to stay. On that evening, defendant asked to have anal sex, but Cheryl refused.

Defendant would refer to Cheryl as his pet and claimed he had "ownership of girls." Defendant had a box of pet collars and gave one to her. Additionally, while having sex, defendant called Cheryl names, such as " 'slut' " or " 'whore.' " Defendant

---

[3] The record states that Cheryl may have also gone by the name Ann O.

3

also told her that when she turned 18, he would tie her up and "make a movie out of it." However the relationship ended before Cheryl turned 18.

Cheryl learned that defendant had other sex partners. Defendant told her that one girl threatened to go to the police, but he prevented her by telling her that he would use her image in a bestiality movie. Defendant would also show Cheryl pictures of his ex-girlfriend tied up. He also made Cheryl watch a movie of him and a 15 or 16-year-old girl, who attended Cheryl's high school, having sex. Defendant also asked Cheryl to bring him " 'sacrifices,' " which he considered short Asian girls between 13 and 16 years of age. On one occasion, defendant asked her to bring a 10-year-old.

### B. Procedural Background

In November 2003, defendant was convicted of two counts of violating Penal Code section 288, subdivision (a) for the acts committed against Elana, two counts of violating Penal Code section 261.5, subdivision (d) for the acts committed against Samantha, and two counts of violating Penal Code section 261.5, subdivision (c) for the acts committed against Cheryl. Defendant was sentenced to six years in prison.

On February 18, 2011, the People filed a petition to commit defendant as an SVP under the SVPA. The petition was supported by four mental health evaluations performed by Jeremy Coles, Ph.D., Mary Jane Alumbaugh, Ph.D., Kathleen Longwell, Ph.D., and Robert M. Owen, Ph.D[4], in December 2010 and January 2011.

A probable cause hearing was held on May 25, 2011 and June 14, 2011. At the hearing, Dr. Longwell testified on behalf of the People. Drs. Coles and Alumbaugh testified for the defense.[5] Based on the evidence presented, the trial court found probable cause to believe defendant was an SVP.

---

[4] Dr. Owen was the only evaluator who concluded that defendant did not meet the criteria of an SVP.

[5] At the probable cause hearing, the defense apparently sought to show that Drs. Longwell, Coles, and Alumbaugh each used different assessment processes and

4

On June 16, 2011, defendant moved to dismiss the petition on the basis that the evaluators had not used a "standardized assessment protocol" as mandated by section 6601, subdivision (c). The trial court denied the motion to dismiss on June 17, 2011.

On May 30, 2012, defendant waived his right to a jury trial and agreed to submit to the trial court the determination of whether he was an SVP. The prosecution submitted mental health evaluations, including updated evaluations done in November 2011 by Drs. Longwell and Coles, and records pertaining to defendant's 2003 convictions. Defendant did not present any evidence at trial.

In their updated evaluations, Drs. Longwell and Coles both diagnosed defendant with paraphilia (specifically, sexual sadism or coercive sexuality) and antisocial personality disorder. They noted that their diagnoses remained unchanged from their prior mental health evaluation reports. They both believed that defendant posed a risk of committing a future sexually violent predatory offense.

Drs. Longwell and Coles assessed defendant's risk of reoffense using different tests and instruments. Dr. Longwell used the Static 99-R, Static 2002-R, the Minnesota Sex Offender Screening Tool-Revised (MnSOST-R), the Sex Offender Risk Assessment Guide (SORAG), and the Structured Risk Assessment, Forensic Version (SRA-FV). All five instruments "have been subject to validation studies that have established their usefulness in predicting sexual re-offense." On the Static 99-R, defendant scored in the group with a moderate to high risk of reoffense. On the Static 2002-R, defendant scored in the group with a moderate risk of reoffense. On the MnSOST-R, defendant scored in the group with the highest risk of reoffense. On the SORAG, defendant scored in the category "5 of 9" risk level of reoffense. Lastly, on the SRA-FV, defendant scored in the "very high risk" category. Based on these scores, Dr. Longwell concluded that defendant is "an essentially untreated, dangerous and deviant sex offender who is at significant risk

diagnosed defendant with different mental disorders in order to highlight that much of the evaluation process was discretionary.

5

to act out his sexually sadistic impulses on other young girls when he is no longer under close supervision." Moreover, "[f]uture sex offenses are likely to be predatory in nature."

Dr. Coles also used the Static 99-R and the Static 2002-R. Based on these scores, Dr. Coles concluded that defendant has not made any fundamental changes. Dr. Coles quoted part of his previous evaluation, in which he concluded that defendant's "significant sexual deviancy is aggravating in terms of his risk for re-offense. . . . [H]e has clear deviant desires related to bondage and dominance and, unfortunately, he has demonstrated that his deviant desires can, and sometimes do, involve forced sexuality." Additionally, Dr. Coles noted that defendant had not participated in sex offender treatment and that his history reveals "a significant preoccupation with sex that involves bondage and coercion with minor females."

Based on the exhibits, the trial court found the petition true and ordered defendant committed to the custody of the Department for an indeterminate term. The order specified that it was "subject to the ultimate decision in" *McKee I*. Then, on November 9, 2012, following the *McKee II* decision, the court committed defendant for an indeterminate term "as previously ordered."

## DISCUSSION

### A. Brief Overview of the SVPA

The SVPA provides for the involuntary civil commitment, for treatment and confinement, of an individual who is found by a unanimous jury verdict (§ 6603, subds. (e) & (f)), and beyond a reasonable doubt (§ 6604), to be a "sexually violent predator" (*ibid.*). The definition of an SVP is set forth in section 6600, subdivision (a)(1) as follows: " 'Sexually violent predator' means a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior."

6

The SVP commitment process "begins when the secretary of the Department of Corrections and Rehabilitation (DCR) determines that a person in custody because of a determinate prison sentence or parole revocation *may* be a sexually violent predator. If such an initial determination is made, the secretary refers the inmate for an evaluation." (*In re Lucas* (2012) 53 Cal.4th 839, 845 (*Lucas*).) "After the secretary's referral, the inmate is screened by the DCR and the Board [of Parole Hearings (Board)] to determine whether the person is *likely* to be an SVP. If the DCR and the Board conclude that is the case, the inmate is referred for full evaluation by the [Department]. (§ 6601, subd. (b).)" (*Ibid.*)

"A full evaluation is done by two practicing psychiatrists or psychologists, or by one of each profession. (§ 6601, subd. (d).) If one evaluator concludes the inmate meets the SVP criteria, but the other evaluator disagrees, two more independent evaluators are appointed. (§ 6601, subd. (e).) A petition for commitment may not be requested unless the initial two evaluators appointed under subdivision (d), or the two independent evaluators appointed under subdivision (e), agree that the inmate meets the commitment criteria. (§ 6601, subds. (d), (f).)" (*Lucas, supra,* 53 Cal.4th at p. 845.) "If, after the full evaluation is completed, the [Department] concludes that the inmate is an SVP, the director of the [Department] requests that a petition for commitment be filed by the district attorney or the county counsel of the county where the inmate was convicted. If upon review that official concurs, a petition for commitment is filed in the superior court. (§ 6601, subds. (h), (i).)" (*Id.* at p. 846.)

With regard to the full evaluation prior to the filing of a petition, former section 6601, subdivision (c), as amended by section 26 of Proposition 83, provided: "The State Department of Mental Health shall evaluate the person in accordance with a standardized assessment protocol, developed and updated by the State Department of Mental Health, to determine whether the person is a sexually violent predator as defined in this article. The standardized assessment protocol shall require assessment of diagnosable mental

7

disorders, as well as various factors known to be associated with the risk of reoffense among sex offenders. Risk factors to be considered shall include criminal and psychosexual history, type, degree, and duration of sexual deviance, and severity of mental disorder."

A commitment petition proceeds to trial only if the requisite findings are made at a probable cause hearing. (See § 6602, subd. (a); *Cooley v. Superior Court* (2002) 29 Cal.4th 228.) "[T]he only purpose of the probable cause hearing is to test the sufficiency of the evidence supporting the SVPA petition. [Citation.]" (*Id.* at p. 247.) ". . . If the judge determines that there is probable cause, the judge shall order that the person remain in custody in a secure facility until a trial is completed . . . ." (§ 6602, subd. (a).)

At trial, the court or jury must "determine whether, beyond a reasonable doubt, the person is a sexually violent predator." (§ 6604.) If the court or jury determines that the person is a sexually violent predator, the person is committed for an indeterminate term. (*Ibid.*)

### B. 2009 Assessment Protocol

Defendant contends the trial court erred by denying his motion to dismiss the petition, in which he argued that the evaluators did not use a "standardized assessment protocol" as mandated by section 6601, subdivision (c).

#### 1. The 2009 Protocol

On February 11, 2009, the Department issued the "Standardized Assessment Protocol for Sexually Violent Predator Evaluations" (2009 Protocol). The 2009 Protocol had been adopted at the time of defendant's probable cause hearing in May and June 2011.

The 2009 Protocol is six pages long. The protocol states in its introduction: "This protocol cannot prescribe in detail how the clinician exercises his or her independent professional judgment in the course of performing SVP evaluations. Since the exercise

8

of independent, professional clinical judgment is required, this evaluation protocol is not, and cannot be, a detailed, precise step-by-step procedure like the kind of procedure that might apply to the chemical analysis of an unknown substance."

Part I of the 2009 Protocol contains statutory definitions of the terms "Sexually Violent Predator," "Sexually violent offense," "Diagnosed mental disorder," and "Predatory."

Part II of the 2009 Protocol is entitled "Referral Source," and it describes the Department's screening process.

Part III of the 2009 Protocol is entitled, "Evaluator Prerequisites," and it contains the requirements of section 6601, subdivision (d) [specifying that evaluations are to be performed by two practicing psychiatrists, two practicing psychologists, or one practicing psychiatrist and one practicing psychologist] and section 6601, subdivision (g) [specifying that if only one evaluator determines the person meets the SVP definition, a further examination must be conducted by two independent professionals meeting certain criteria].

Part IV-A of the 2009 Protocol specifies the information that evaluators must give to the potential SVP, as required by section 6601, subdivision (f). Part IV-B lists the risk factors that must be taken into account pursuant to section 6601, subdivision (c) – that is, criminal history, psychosexual history, type of sexual deviance, degree of sexual deviance, duration of sexual deviance, and severity of mental disorder. Part IV-C states the inquiry that must be answered by each evaluator: "Does the person being evaluated have a diagnosed mental disorder so that he or she is likely to engage in acts of sexual violence without appropriate treatment and custody?"

Part IV-D of the 2009 Protocol (codified in section 4005 of the California Code of Regulations, title 9) provides: "The evaluator, according to his or her professional judgment, shall apply tests or instruments along with other static and dynamic risk factors when making the assessment. Such tests, instruments and risk factors must have gained

9

professional recognition or acceptance in the field of diagnosing, evaluating or treating sexual offenders and be appropriate to the particular patient and applied on a case-by-case basis.  The term 'professional recognition or acceptance' as used in this Section means that the test, instrument or risk factor has undergone peer review by a conference, committee or journal of a professional organization in the fields of psychology or psychiatry, including, but not limited to, the American Psychological Association, the American Psychiatric Association, and the Association for the Treatment of Sexual Abusers."

Part IV-E of the 2009 Protocol specifies the process for updated evaluations as provided in section 6603, subdivision (c)(1).  Part IV-F discusses several judicial opinions, including the United States Supreme Court's decision in *Kansas v. Crane* (2001) 534 U.S. 407 (*Crane*).

Part V of the 2009 Protocol explains what happens if the evaluation process results in agreement that the person is an SVP.

In Part VI, the 2009 Protocol recommends that evaluators be "knowledgeable and familiar with literature, studies, and tests or instruments used in the field of evaluation and diagnosis of sex offenders, as well as the latest developments in these areas."  It also advises evaluators to, among other things, "obtain, review, and consider all relevant information and records that bear upon the case and be prepared to testify and undergo cross examination regarding these sources of information and how they contributed to the conclusions reached in the evaluation."

### 2.    Proceedings Below

In his motion to dismiss the petition, defendant argued that the 2009 Protocol was not a "standardized assessment protocol" as required by section 6601, subdivision (c) because it "expressly eschews any specific procedures to be followed or any designated risk assessments or tests to be used."  He asserted the 2009 Protocol failed to include any specified and uniform procedures for evaluators to follow when performing SVP

10

assessments. Rather, the 2009 Protocol "leave[s] to the discretion of each evaluator which tests and instruments to use, and which static and dynamic risk factors to consider." Defendant also argued that the 2009 Protocol was invalid and that its use violated his "statutory and constitutional rights . . . , including his right to due process of law." He argued that the appropriate remedy was dismissal of the petition.

Defendant's motion to dismiss was supported by declarations from Richard Wollert, Ph.D. and Robert L. Halon, Ph.D. Dr. Wollert opined that the 2009 Protocol is "not a 'standardized assessment protocol,' as that term is understood in the scientific and psychological community" and it "cannot be relied upon to achieve the fundamental goal of a valid, standardized assessment protocol, i.e., to be a reliable, and relevant method for answering a given referral question that enables different evaluators to reach identical conclusions about a given person and report these conclusions in a similar format." Dr. Halon expressed a similar opinion, stating that "adhering to the instructions contained [in the 2009 Protocol] cannot produce a reliable assessment, i.e., one which, using the same database, methods and procedures, always achieves *objective* results, whatever they might be, with each individual being assessed."

The prosecution submitted opposition to the motion to dismiss. The prosecution noted that the term "standardized assessment protocol" (§ 6601, subd. (c)) is not defined in the statute. In interpreting the plain meaning of "standardized assessment protocol," the prosecution argued that the Legislature "wanted evaluations and assessments to follow the same general outline" but did not intend each evaluator to follow "an identical routine." The prosecution further argued that "[b]ecause determination of SVP and mental disposition is a social science and not a hard science, the protocol must allow for professional judgment and discretion in evaluating mental health . . . on a case-by-case basis" and that a more detailed protocol would "likely create difficulties by improperly restricting the critical role professional judgment plays in any psychological forensic evaluation." Additionally, the prosecution argued that even if the 2009 Protocol was

11

invalid, the proper remedy would not have been dismissal of the petition. Instead, the proper remedy would be to order new evaluations under a valid protocol.

In support of its opposition, the prosecution attached the transcript of a May 11, 2009 regulatory hearing held by the Department. The topic of the hearing was the proposed adoption of section 4005 of the California Code of Regulations, title 9, which is part of the 2009 Protocol and is quoted above. At the hearing, several speakers argued that the protocol should not be adopted because it did not give specific guidance to the evaluators and would not ensure a uniform evaluation system. In its opposition to defendant's motion, the prosecution argued that the hearing transcript showed that defendant's arguments had been considered but rejected.

The prosecution's opposition was further supported by a declaration from Amy Phenix, Ph.D. Dr. Phenix had been "tasked with developing the first Standardized Assessment Protocol," and she had provided the Department with updates to the protocol. She opined that the 2009 Protocol "comports with the generally accepted definition of a 'standardized assessment protocol.' " Her declaration described the training that SVP evaluators must go through, and she cited various papers and guidelines for the principle that SVP evaluators should use their professional judgment in selecting the tests or instruments for assessing a particular individual's risk of reoffense.

On June 17, 2011, the trial court denied defendant's motion to dismiss.

### 3. Analysis

As he did below, defendant argues that the 2009 Protocol is not a "standardized assessment protocol" as required by section 6601, subdivision (c). Furthermore, he contends that use of the invalid protocol was a violation of due process.

Defendant contends that the 2009 Protocol is not a "standardized protocol" as required by section 6601, subdivision (c) because it "does not contain any detailed or uniform procedures for evaluators to follow when performing SVP evaluations." According to defendant, a " 'standardized' protocol would describe the same objective,

12

scientific, empirically based methodology, so that all evaluators could operate under the same guidelines, using well-defined objectives and criteria."

The Attorney General notes that the phrase "standardized assessment protocol" is not defined in section 6601 and that nothing in that phrase "mandates a required level of detail." The Attorney General argues that the 2009 Protocol requires "basic uniformity" in evaluations, by informing evaluators of the legal requirements for SVP evaluations, requiring them to use risk assessment instruments, tests, or unenumerated risk factors that are accepted in the field, recommending that evaluators be knowledgeable and familiar with developments in the field, and recommending that evaluators obtain, review, and consider all relevant information. The Attorney General contends deference is due to the Department's determination that the need for evaluators to exercise independent professional judgment necessarily means that a detailed, step-by-step procedure cannot be prescribed.

We agree with the trial court that defendant has not established that the 2009 Protocol is invalid. Defendant has not cited, nor have we found, any legislative history supporting his assertion that the Legislature intended the phrase "standardized assessment protocol" to convey a specific degree of standardization. (§ 6601, subd. (c).) By specifying that the "standardized assessment protocol" be "developed and updated by the State Department of [State Hospitals]" (*ibid.*), the Legislature indicated that it was leaving the determination of detail and standardization to the Department. As the United States Supreme Court has recognized, "the Constitution's safeguards of human liberty in the area of mental illness and the law are not always best enforced through precise bright-line rules," and "the science of psychiatry, which informs but does not control ultimate legal determinations, is an ever-advancing science . . . ." (*Crane, supra,* 534 U.S. at p. 413.) And, as the California Supreme Court has recognized, the statutory scheme is designed to allow the evaluators to exercise their "*professional* judgment . . . within a specified *legal* framework." (*People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888,

13

910.)  In line with that intent, the 2009 Protocol ensures that the evaluators have a "legally accurate understanding of the statutory criteria," which "is crucial to the [SVPA's] proper operation." (*Ibid*.)

Even assuming that the 2009 Protocol is not valid as a "standardized assessment protocol" (§ 6601, subd. (c)), defendant is not entitled to appellate relief.  Defendant argues the trial court lacked jurisdiction to proceed with his commitment since he was evaluated by an invalid protocol.  He contends that dismissal of the petition was the appropriate remedy.  Defendant acknowledges that *People v. Medina* (2009) 171 Cal.App.4th 805, 818-819 (*Medina*), a case involving a similar challenge to an SVP commitment, suggested that an appellant must show some prejudice in order to obtain appellate relief.  Defendant claims that to the extent that *Medina* required him to show prejudice, it was "sufficient that the petition should have been dismissed.  [Citations.] Had the court not erred, the petition would have been dismissed."

Here, the trial court would not have been deprived of jurisdiction to proceed with defendant's commitment proceedings.  "Use of the evaluations based on the invalid assessment protocol, though erroneous, does not deprive the trial court of fundamental jurisdiction over the SVPA commitment petition.  The trial court has the power to hear the petition notwithstanding the error in using the invalid assessment protocol." (*In re Ronje* (2009) 179 Cal.App.4th 509, 518; see also *Medina, supra*, 171 Cal.App.4th at pp. 816-818.)  Furthermore,"[i]llegalities in pretrial commitment proceedings that are not 'jurisdictional in the fundamental sense,' are not reversible error per se on an appeal from the subsequent trial.  Rather, the 'defendant [must] show that he was deprived of a fair trial or otherwise suffered prejudice as a result of the error at the preliminary examination.' [Citation]." (*In re Wright* (2005) 128 Cal.App.4th 663, 673; see also *Medina, supra*, 171 Cal.App.4th at pp. 818-819; *Reilly v. Superior Court* (2013) 57 Cal.4th 641, 653 (*Reilly*).)  In *Reilly*, the Supreme Court clarified that a defendant may obtain "relief arising from use of an invalid protocol in an SVP evaluation" only if he or

she demonstrates that "the error was material." (*Id.* at p. 655.) That is, defendant can show prejudice only if there is " 'a reasonable probability, sufficient to undermine confidence in the outcome, that the error affected the evaluator's ultimate conclusion' " or that the error " 'reasonably *might* have affected the outcome' " of the proceedings. (See *id.* at p. 654.)

In this case, the trial court found probable cause to believe defendant was an SVP, and it ultimately found him to be an SVP at trial, after considering evidence of his sexually violent offenses, his diagnosed mental disorders, and his scores on numerous risk assessment tools. Defendant presented no evidence to contradict the evaluations presented at trial, and he "does not contend the evidence was insufficient to support [the trial court's] finding." (*People v. Landau* (2013) 214 Cal.App.4th 1, 17 (*Landau*).) Under the circumstances, "[t]here is no indication in this record" that the initial evaluations, conducted pursuant to the 2009 Protocol, "affected defendant's trial." (See *People v. Pompa-Ortiz* (1980) 27 Cal.3d 519, 530.) In short, defendant has failed to show that the use of the 2009 Protocol resulted in a material error (*Reilly, supra,* 57 Cal.4th at p. 655), and thus we conclude he is not entitled to any relief.

Defendant relies on *Butler v. Superior Court* (2000) 78 Cal.App.4th 1171 (*Butler*), *Peters v. Superior Court* (2000) 79 Cal.App.4th 845 (*Peters*), and *People v. Superior Court (Gary)* (2000) 85 Cal.App.4th 207, arguing that "substantive irregularities in the evaluation process, foundational to the filing of a recommitment petition, required the petition to be dismissed." However, defendant's reliance on those cases is misplaced. In *Butler,* the prosecutor filed a petition under the SVPA based on only one evaluation by a mental health professional. (*Butler, supra*, 78 Cal.App.4th at p. 1174.) This court issued a writ of mandate directing the trial court to dismiss the petition. (*Ibid.*) In an identical factual situation, the court in *Peters* issued a writ of mandate ordering the trial court to set aside its order denying the defendant's motion to dismiss. (*Peters, supra*, 79 Cal.App.4th at pp. 847, 851.) In *Gary,* the trial court dismissed the petition for recommitment under

15

the SVPA because one of the mental health professionals recommended against recommitment. (*Gary, supra*, 85 Cal.App.4th at p. 211.) The reviewing court denied the People's writ petition. (*Id.* at p. 220.) In contrast to these cases, here, there were two or more evaluations determining that defendant met the criteria of an SVP; defendant did not file a writ petition and the matter proceeded to trial; and at trial, defendant did not present any evidence proving that he was not an SVP. Given the procedural posture of the case, appellant was required to show prejudice at trial, and he failed to do so.

### C. Equal Protection

Defendant contends that the SVPA's indeterminate commitment scheme violates principles of equal protection. He claims that the SVPA "unjustifiably treats persons subject to SVP commitments more harshly than persons subject to the state's other civil commitment schemes."

In *McKee I*, the defendant argued that his indeterminate commitment under the SVPA violated his equal protection rights because the SVPA treats SVP's significantly less favorably than similarly situated individuals who are civilly committed under other statutes. (*McKee I*, *supra*, 47 Cal.4th at p. 1196.)

The California Supreme Court determined that SVP's and mentally disordered offenders (MDO's; Pen. Code, § 2960 et seq.) are similarly situated for equal protection purposes because they have been involuntarily committed with the objectives of treatment and protection of the public. (*McKee I*, *supra*, 47 Cal.4th at p. 1203.) The court also determined that SVP's have "different and less favorable procedural protections" than MDO's because "SVP's under the amended [SVPA] are given indeterminate commitments and thereafter have the burden to prove they should be released (unless the [Department] authorizes a petition for release). In contrast, an MDO is committed for a one-year period and thereafter has the right to be released unless the People prove beyond a reasonable doubt that he or she should be recommitted for another year." (*Id.* at p. 1202.) The court rejected the appellate court's finding that "the

16

legislative findings recited in the [Proposition 83] ballot initiative" were sufficient to justify the disparate treatment of SVP's and MDO's. (*Id.* at p. 1207.)

The California Supreme Court found that SVP's and persons not guilty of a felony by reason of insanity (NGI's; Pen. Code, § 2960 et seq.) are also similarly situated and "a comparison of the two commitment regimes raises similar equal protection problems . . . ." (*McKee I, supra*, 47 Cal.4th at p. 1207.) Consequently, the court agreed with the defendant "that, as with MDO's, the People have not yet carried their burden of justifying the differences between the SVP and NGI commitment statutes." (*Ibid*.)

However, in *McKee I*, the California Supreme Court did "not conclude that the People could not meet [their] burden of showing the differential treatment of SVP's is justified." (*McKee I, supra*, 47 Cal.4th at p. 1207.) The court gave the People "an opportunity to make the appropriate showing on remand," noting that the People would have to show that "notwithstanding the similarities between SVP's and MDO's, the former as a class bear a substantially greater risk to society, and that therefore imposing on them a greater burden before they can be released from commitment is needed to protect society." (*Id.* at p. 1208.)

The *McKee I* court then remanded the case with the following instructions: "We therefore remand this case to the trial court to determine whether the People, applying the equal protection principles articulated in [*In re Moye* (1978) 22 Cal.3d 457 (*Moye*)] and related cases discussed in the present opinion, can demonstrate the constitutional justification for imposing on SVP's a greater burden than is imposed on MDO's and NGI's in order to obtain release from commitment. The trial court may, if appropriate, permit expert testimony. [¶] . . . On remand, the government will have an opportunity to justify Proposition 83's indefinite commitment provisions, at least as applied to McKee, and demonstrate that they are based on a reasonable perception of the unique dangers that SVP's pose rather than a special stigma that SVP's may bear in the eyes of California's electorate. [¶] Moreover, we emphasize that mere disagreement among experts will not

17

suffice to overturn the Proposition 83 amendments.  The trial court must determine whether the legislative distinctions in classes of persons subject to civil commitment are reasonable and factually based—not whether they are incontrovertible or uncontroversial. The trial court is to determine not whether the statute is wise, but whether it is constitutional." (*McKee I*, *supra*, 47 Cal.4th at pp. 1208-1211, fns. omitted.)

On remand from *McKee I*, "the trial court conducted an evidentiary hearing to determine whether the People could justify the [SVPA's] disparate treatment of SVP's under the strict scrutiny standard for equal protection claims.  At the hearing, the People presented the testimony of eight witnesses and documentary evidence.  The trial court also allowed McKee to present evidence; he presented the testimony of 11 witnesses and documentary evidence.  The court issued a 35-page statement of decision summarizing the extensive testimonial and documentary evidence presented at the hearing and finding the People had met their burden to establish, by a preponderance of the evidence, that the disparate treatment of SVP's under the [SVPA] was based on a reasonable perception of the greater and unique dangers they pose compared to MDO's and NGI's." (*McKee II, supra,* 207 Cal.App.4th at p. 1332.)

McKee appealed, and Division One of the Fourth Appellate District affirmed the trial court's order.  (*McKee II, supra,* 207 Cal.App.4th at pp. 1330-1331, 1350.)  In *McKee II*, the appellate court explained that it would "independently determine whether the People presented substantial, factual evidence to support a reasonable perception that SVP's pose a unique and/or greater danger to society than do MDO's and NGI's, thereby justifying the disparate treatment of SVP's under the [SVPA]." (*Id.* at p. 1338.)

After performing its independent review of the evidence presented in the 21-day evidentiary hearing held in the trial court (*McKee II, supra,* 207 Cal.App.4th at p. 1330), the *McKee II* court made several findings.  First, with respect to recidivism, the court determined that the expert witness testimony of three psychologists, as well several studies and the Static-99 data comparing recidivism rates, was sufficient to show that "the

18

inherent nature of the SVP's mental disorder makes recidivism as a class significantly more likely than recidivism of sex offenders generally, but does not show SVP's have, in fact, a higher sexual recidivism rate than MDO's and NGI's. . . . Regardless of the shortcomings or inadequacy of the evidence on actual sexual recidivism rates, the Static-99 evidence . . . supports, by itself, a reasonable inference or perception that SVP's pose a higher *risk* of sexual reoffending than do MDO's or NGI's." (*Id.* at p. 1342.)

The Static-99 evidence included in the Department's data showed that the average Static-99 score for all SVP's civilly committed since 2006 was 6.19, which placed them in the " 'high' risk category for sexual reoffense." (*McKee II*, *supra*, 207 Cal.App.4th at p. 1341.) In contrast, the average Static-99 score for MDO's at Patton State Hospital subject to sex offender registration under Penal Code section 290 in 2010 was 3.6, "placing them in the 'moderate-low' risk category for sexual reoffense." (*Ibid*.) The average Static-99 score for all patients discharged from Atascadero State Hospital since January 1, 2010, and subject to sex offender registration, including MDO's and NGI's, was 4.6, which placed them in the " 'moderate-high' risk category for sexual reoffense." (*Id*. at pp. 1341-1342.)

Second, the *McKee II* court considered whether the People had "presented evidence that the victims of sex offenses suffer unique and, in general, greater trauma than victims of nonsex offenses." (*McKee II*, *supra*, 207 Cal.App.4th at p. 1342.) Based on the expert witness testimony, the court concluded that "there is substantial evidence to support a reasonable perception by the electorate, as a legislative body, that the harm caused by child sexual abuse and adult sexual assault is, in general, a greater harm than the harm caused by other offenses and is therefore deserving of more protection." (*Id*. at pp. 1343-1344.)

Third, the *McKee II* court found that there was "substantial evidence to support a reasonable perception by the electorate that SVP's have significantly different diagnoses

from those of MDO's and NGI's,[6] and that their respective treatment plans, compliance, and success rates are likewise significantly different. That evidence and the evidence on recidivism . . . , as the trial court found, 'supports the conclusion that, as a class, SVP's are clinically distinct from MDO's and NGI's and that those distinctions make SVP's more difficult to treat and more likely to commit additional sexual offenses than are MDO's and NGI's.' In particular, SVP's are less likely to participate in treatment, less likely to acknowledge there is anything wrong with them, and more likely to be deceptive and manipulative. . . . Furthermore, there is substantial evidence to support a reasonable inference that an indeterminate, rather than a determinate (e.g., two-year), term of civil commitment supports, rather than detracts from, the treatment plans for SVP's." (*McKee II*, *supra*, 207 Cal.App.4th at p. 1347.)

The appellate court therefore concluded in *McKee II* that "the People on remand met their burden to present substantial evidence, including medical and scientific evidence, justifying the amended [SVPA's] disparate treatment of SVP's (e.g., by imposing indeterminate terms of civil commitment and placing on them the burden to prove they should be released). [Citation.]" (*McKee II*, *supra*, 207 Cal.App.4th at p. 1347.) Accordingly, the trial court's order rejecting the defendant's equal protection claim and affirming his indeterminate commitment under the SVPA was upheld. (*Id.* at p. 1350.) The California Supreme Court denied review of *McKee II* on October 10, 2012, and therefore the proceedings on remand from *McKee I* are now final.

Defendant contends that "[t]he *McKee II* opinion contains three significant flaws": (1) it failed to properly conduct a de novo review; (2) it failed to properly apply the strict

---

**6** Dr. David Fennell, a psychiatrist and the chief of forensics at Atascadero State Hospital, testified that "MDO's and NGI's with a sexual predicate offense were not more likely to commit a new sexual offense (versus another dangerous offense) on release because their mental disorders made them disorganized and unpredictable. In comparison, SVP's are more likely to commit a new sexual offense because of their diagnoses with pedophilia or other paraphilias." (*McKee II*, *supra*, 207 Cal.App.4th at p. 1345.)

20

scrutiny test; and (3) under a proper application of the strict scrutiny test, the facts it relied upon did not justify a disparate treatment of SVP's.

First, we disagree with defendant's claim that the *McKee II* court failed to properly conduct a de novo review. Defendant acknowledges that the appellate court stated that it was conducting a de novo review (*McKee II, supra,* 207 Cal.App.4th at p. 1338), but he points out that the appellate court stated that it was determining "whether the People presented substantial evidence to support a reasonable inference or perception that the [SVPA's] disparate treatment of SVP's is necessary to further compelling state interests. [Citations.]" (*Id.* at p. 1339.) He argues that the above standard "does not describe *de novo* review." Further, he asserts that the court's review of the evidence did not satisfy the de novo standard, as the court ignored McKee's evidence and accepted the People's evidence as accurate.

Having reviewed the opinion, we believe the *McKee II* court's description of its review is consistent with an independent, de novo review of the evidence, as well as with the Supreme Court's opinion and directions in *McKee I*. After the *McKee I* court remanded the case, the *McKee II* court independently reviewed *all* of the evidence and concluded that "the disparate treatment of SVP's under the [SVPA] is reasonable and factually based and was adequately justified by the People at the evidentiary hearing on remand." (*McKee II, supra,* 207 Cal.App.4th at p. 1348.) We discern no error. Additionally, we note that other courts have rejected a similar challenge to *McKee II*. (See *People v. McKnight* (2012) 212 Cal.App.4th 860, 864 (*McKnight*) [finding that the "claim that the appellate court failed to independently review the trial court's determination is frivolous"]; *Landau, supra*, 214 Cal.App.4th at p. 47-48; *People v. McDonald* (2013) 214 Cal.App.4th 1367, 1378, 1381.)

Second, we reject defendant's claim that the *McKee II* court in effect applied a rational basis test rather than a strict scrutiny test in reviewing the evidence presented at the hearing. Defendant claims that "it was not enough to simply show that the legislature

21

or the voters could reasonably believe that SVP[']s were more dangerous as a class. The prosecution had to show that SVP[']s actually were more dangerous as a class." He criticizes *McKee II* for analyzing only whether the voters had a " 'reasonable perception' " that SVP's are more dangerous than MDO's or NGI's, rather than whether those perceptions were accurate. (*McKee II, supra,* 207 Cal.App.4th at p. 1342.)

We disagree that *McKee II* failed to apply strict scrutiny. The *McKee II* court referred to the issue as "whether the People presented substantial evidence to support a reasonable inference or perception that the [SVPA's] disparate treatment of SVP's is *necessary* to further compelling state interests. [Citations.]" (*McKee II, supra,* 207 Cal.App.4th at p. 1339, italics added.) Moreover, the appellate court's use of the phrase "reasonable inference or perception" (*ibid.*) reflects the California Supreme Court's remand instructions: in *McKee I,* the court stated, "On remand, the government will have an opportunity to justify Proposition 83's indefinite commitment provisions . . . and demonstrate that they are based on a reasonable perception of the unique dangers that SVP's pose rather than a special stigma that SVP's may bear in the eyes of California's electorate." (*McKee I, supra,* 47 Cal.4th at p. 1210, fn. omitted.) Thus, in applying the strict scrutiny test, *McKee II* followed the language set forth in *McKee I.*

Furthermore, defendant argues that the People failed to show that the disparate treatment of SVP's (i.e., shifting the burden of proof, eliminating periodic jury trials, and imposing an indeterminate term) was necessary. Relying on *Bernal v. Fainter* (1984) 467 U.S. 216 (*Bernal*) and *Dunn v. Blumstein* (1972) 405 U.S. 330, defendant argues that "[t]he element of necessity under the strict scrutiny standard required that the prosecution show that the disparate treatment of SVP[']s constituted the least restrictive means possible." Defendant contends that the *McKee II* court misapplied the strict scrutiny test by improperly "reject[ing] the need for the prosecution" to show that the disparate treatment of SVP's was the least restrictive means.

22

McKee made a similar argument relying on *Bernal*, and the *McKee II* court rejected it. (*McKee II, supra,* 207 Cal.App.4th at p. 1349.) In *Bernal,* the United States Supreme Court stated that "[i]n order to withstand strict scrutiny, the law must advance a compelling state interest by the least restrictive means available." (*Bernal, supra,* 467 U.S. at p. 219.) The *McKee II* court described the quoted sentence from *Bernal* as "probable dictum," distinguishing *Bernal* because it involved a suspect class, alienage. (*McKee II, supra,* 207 Cal.App.4th at p. 1349.) "We are unaware of any case applying the 'least restrictive means available' requirement to all cases involving disparate treatment of similarly situated classes," the *McKee II* court wrote. (*Ibid.*) "On the contrary, our review of equal protection case law shows the two-part test, as discussed in *Moye*[*, supra*, 22 Cal.3d 457] and *McKee* [*I*], is the prevailing standard. . . . Therefore, in strict scrutiny cases, the government must show both a compelling state interest justifying the disparate treatment *and* that the disparate treatment is necessary to further that compelling state interest. [Citations.] We are unpersuaded the electorate that passed Proposition 83 in 2006 was required to adopt the least restrictive means available (e.g., a two-year or other determinate term of civil commitment) in disparately treating SVP's and furthering the compelling state interests of public safety and humane treatment of the mentally disordered." (*McKee II, supra,* 207 Cal.App.4th at p. 1349.)

We agree with the *McKee II* court's analysis of this issue. We note that *Moye,* like *McKee II* and like this case, involved an equal protection challenge to a civil commitment statute. In remanding the case in *McKee I*, the California Supreme Court instructed the trial court to "apply[] the equal protection principles articulated in *Moye* and related cases discussed in the [*McKee I*] opinion" (*McKee I, supra*, 47 Cal.4th at p. 1208), and to determine whether, after a trial, the People had shown that imposing on SVP's greater burdens to obtain release from commitment is necessary to promote the state's compelling interests in public safety and humane treatment of the mentally ill (*id*. at pp. 1207-1211). Given the evidence presented in *McKee II* – that the vast majority of

23

SVP's are diagnosed with pedophilia or other paraphilias, that a paraphilia ordinarily persists throughout a patient's lifetime, that treatment is not focused on medication, and that most SVP's do not participate in treatment (*McKee II, supra,* 207 Cal.App.4th at pp. 1344-1345) – we have no basis for concluding that an indeterminate term is not necessary to further the compelling state interest in providing treatment to SVP's and protecting the public or that there is any less burdensome alternative to effectuate those interests.

Third, we disagree with defendant's contention that the evidence in the *McKee II* trial did not support the appellate court's ruling that SVP's were more dangerous than MDO's and NGI's and thus harsher treatment was necessary. Defendant makes several contentions in this regard.

Defendant claims that *McKee II* erroneously concluded that "[t]he People presented evidence showing the inherent nature of the SVP's mental disorder makes recidivism significantly more likely for SVP's as a class than for MDO's and NGI's." (*McKee II*, *supra*, 207 Cal.App. 4th at p. 1340.) Specifically, he contends the appellate court did not examine any evidence comparing the sexual recidivism rate of SVP's with the sexual recidivism rate of MDO's and NGI's; rather, the court compared the SVP's rate of reoffending with rates of other types of crimes, which was "not relevant to the matter at hand."

In *McKee II*, the People presented the testimony of three expert witnesses, studies, and the Static-99 data comparing recidivism rates. The *McKee II* court acknowledged that the evidence presented only showed that "the inherent nature of the SVP's mental disorder makes recidivism as a class significantly more likely than recidivism of sex offenders generally, but does not show SVP's have, in fact, a higher sexual recidivism rate than MDO's and NGI's." (*McKee II*, *supra*, 207 Cal.App. 4th at p. 1342.) Nonetheless, the court found that the recidivism rate evidence was " 'significant, given that the goal of the SVP[A] is specifically to protect society from particularly serious

24

sexual offenses.' " (*Ibid.*) In reaching this inference, *McKee II* relied, in part, on evidence that the scores on the Static-99 test, which assesses the *risk* that a sex offender will commit new sex offenses, was higher for SVP's than for non-SVP sex offenders. (*Id.* at p. 1342.) The court noted that "[r]egardless of the shortcomings or inadequacy of the evidence on actual sexual recidivism rates, the Static-99 evidence . . . supports, by itself, a reasonable inference or perception that SVP's pose a higher *risk* of sexual reoffending than do MDO's or NGI's." (*Ibid.*) In so concluding, *McKee II* thus followed *McKee I,* where the California Supreme Court suggested that evidence concerning a greater *risk* of recidivism by SVP's was one type of evidence that the People might present to show that "notwithstanding the similarities between SVP's and MDO's, the former as a class bear a substantially greater risk to society, and that therefore imposing on them a greater burden before they can be released from commitment is needed to protect society." (*McKee I, supra,* 47 Cal.4th at p. 1208.)

Defendant also claims that *McKee II* reached its conclusion that victims of sex offenses suffer greater trauma without any evidence regarding the trauma caused by non-sex offenses. Defendant contends that (1) the testimony of the medical experts was focused on child sexual abuse and that "[i]t is unclear if that testimony is properly extrapolated to adult victims of sexual offenses," and (2) the court cited to no evidence regarding the effects and trauma suffered by victims of other types of crime. We disagree. First, although one of the three medical experts testified specifically about child sexual abuse, the two other experts testified generally about sexual abuse victims. (*McKee II*, *supra*, 207 Cal.App.4th at pp. 1342-1343.) Second, the evidence relied on by the *McKee II* court included testimony that "[s]exual trauma differs qualitatively from other traumas because of its intrusiveness and long-lasting effects," and that "[d]ysfunction, disassociation and avoidance problems after sexual trauma are unique to sexual abuse and are not seen in victims of physical or other types of abuse." (*Ibid.*)

Defendant further claims that the evidence concerning differences in diagnoses, treatment, compliance, and success rates between SVP's and MDO's or NGI's did not support "the need to eliminate periodic jury trials, the need to shift the burden of proof, or the need to impose indeterminate commitments." Defendant claims that (1) the *McKee II* court, in reviewing the evidence, conducted a substantial evidence review rather than a de novo review, (2) treatment is not actually required before an SVP may be eligible for release, and (3) the *McKee II* court failed to consider whether indeterminate commitments were the least restrictive means and that a commitment term of five years would have been a less restrictive mean.

We are not persuaded by defendant's argument. As discussed, the *McKee II* court conducted a proper de novo review, which followed the Supreme Court's opinion and direction in *McKee I*. The court determined whether there was substantial evidence that " 'supports the conclusion that, as a class, SVP's are clinically distinct from MDO's and NGI's and that those distinctions make SVP's more difficult to treat and more likely to commit additional sexual offenses than are MDO's and NGI's.' " (*McKee II*, *supra*, 207 Cal.App.4th at p. 1347; see also *McKnight*, *supra*, 212 Cal.App.4th at p. 864.) As to defendant's claim that treatment is not a requirement for an SVP's release and to the extent conflicting evidence was introduced at the trial, the People's burden was to show that "the legislative distinctions in classes of persons subject to civil commitment are reasonable and factually based—not [that] they are incontrovertible or uncontroversial." (*McKee I*, *supra*, 47 Cal.4th at pp. 1210-1211; accord, *McKee II*, *supra*, 207 Cal.App.4th at p. 1348.) Indeed, the People fulfilled this burden by presenting expert testimony and studies, which supported the finding that treatment of SVP's is significantly different from treatment of MDO's and NGI's and that SVP's are less likely to participate in treatment. Defendant also fails to make a persuasive argument that the SVPA's imposition of an indeterminate term of commitment was not the least restrictive means to further the state's compelling interest in protecting the public and providing treatment to

26

SVP's or that a five-year term would equally effectuate those interests. As discussed, the court conducted a proper strict scrutiny analysis in determining that imposing greater burdens on SVP's was necessary to further the state's compelling interests. Furthermore, narrow tailoring to serve a compelling state interest does not require exhaustion of every conceivable alternative. (See *Grutter v. Bollinger* (2003) 539 U.S. 306, 339.)

Lastly, defendant asserts that "there were three separate but related elements that were under attack in McKee's equal protection challenge," that is, the indeterminate term of commitment, the elimination of the right to a periodic jury trial, and the shifting of the burden of proof. Defendant argues that the evidence presented in *McKee II* did not address the latter two issues. This argument is without merit. Following independent review of the evidence, *McKee II* concluded that "the People on remand met their burden to present substantial evidence, including medical and scientific evidence, justifying the amended [SVPA's] disparate treatment of SVP's (e.g., by imposing indeterminate terms of civil commitment and placing on them the burden to prove they should be released)," and that "the disparate treatment of SVP's under the [SVPA] is reasonable and factually based and was adequately justified by the People at the evidentiary hearing on remand." (*McKee II, supra,* 207 Cal.App.4th at pp. 1347, 1348.)

In light of the Supreme Court's clearly expressed intent to avoid an unnecessary multiplicity of proceedings, the Supreme Court's denial of review in *McKee II,* and our conclusions regarding the asserted flaws in *McKee II,* we find that defendant's equal protection claims are without merit and do not require a remand for a further evidentiary hearing.

**DISPOSITION**

The judgment is affirmed.

27

_____

BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____

MÁRQUEZ, J.

_____

GROVER, J.